IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| JONATHAN CUSHMAN CPA LLC, | CV 24-65-M-DWM |
| Plaintiff, | |
| vs. | OPINION |
| | and ORDER |
| MICHELLE BABCOCK, | |
| Defendant. | |

This case arises out of a dispute between a Maine-based accounting firm, Plaintiff Johnathan Cushman CPA, LLC ("Cushman") and a Montana-based bookkeeper and former Cushman employee, Defendant Michelle Babcock ("Babcock"). Cushman alleges that after it trained Babcock to perform accounting services for a client, the Kiowa Tribe ("Kiowa"), she left the firm to provide accounting services for Kiowa in violation of the restrictive covenants in her employment contract. (*See* Doc. 17.) Cushman sued Babcock, alleging breach of contract, tortious interference with prospective economic advantage, and unjust enrichment. (*See* Docs. 1, 17.)

There are five pending motions. Both parties seek partial summary judgment on Cushman's breach of contract claim. (*See* Docs. 20, 25.) Babcock has moved to strike Cushman's response to her "Statement of Additional Facts"

1

and attached exhibits Cushman filed in support of its reply brief, (*see* Docs. 39, 40). (Doc. 42.)  Additionally, the parties have a discovery dispute regarding Babcock's obligation to disclose information about her work with Kiowa. (*See* Docs. 44, 46.)  A motion hearing was held on April 7, 2025.  Ultimately, both motions for partial summary judgment are granted in part and denied in part. Babcock's motion to strike is denied.  While Cushman's motion to compel discovery is granted, the resulting disclosures will be subject to protections and, because Babcock's discovery position was reasonable, no fees are awarded.  Thus, both Cushman's motion to compel and Babcock's motion for a protective order are granted in part and denied in part as outlined below.

## BACKGROUND

Cushman is a Maine-based limited liability company that provides accounting, auditing, and consulting services to governments and governmental entities. (Doc. 27 at ¶ 1.)  Cushman transacts business in multiple states and, as of 2018, is registered to do business in Montana, though it does not have any clients in Montana. (*Id.* ¶ 2.)  In May 2018, Cushman hired Babcock as a remote employee at a rate of $20/hour. (*Id.* ¶ 7; Doc. 34 at ¶¶ 29, 45.)  Babcock is not a CPA but holds a master's degree in accounting. (Doc. 27 at ¶ 5.)  While at Cushman, Babcock worked out of her home in Kalispell, Montana, serving clients in multiple states. (*Id.* ¶¶ 4, 11; Doc. 34 at ¶¶ 45, 47, 48.)  Most of Babcock's

work, however, was for the Kiowa Tribe in Oklahoma. (Doc. 27 at ¶ 20.) Thus, Babcock learned of Kiowa and its accounting needs through Cushman. (Doc. 34 at ¶ 68.) Because Babcock performed her work for Cushman in Montana, Cushman paid Montana income taxes and workers' compensation insurance. (*Id.* ¶¶ 63, 65–66.) Babcock was also Cushman's registered agent in Montana. (*Id.* ¶ 67.)

The dispute here arises out of the "Employment Agreement" entered into by Babcock and Cushman in December 2018. (*See* Doc. 22-2.) It is undisputed that Babcock and Cushman did not have an employment contract for the first seven months Babcock worked for Cushman. (Doc. 27 at ¶ 9.) It is also undisputed that the Employment Agreement was sent to Babcock on December 11, 2018, and returned, signed, on December 12, 2018.[1] (*See id.* ¶ 10; *see also* Doc. 34 at ¶¶ 32, 39.) However, the parties disagree about the facts leading to the Agreement, specifically (1) whether the restrictive covenants contained in the Agreement were discussed at Babcock's "six-month review" that occurred on November 20, 2018, and (2) whether Babcock received independent consideration for the Agreement.

According to Babcock, she received a raise prior to her six-month review and while a putative employment agreement was referenced at that review, that discussion did not address any substantive provisions of the future contract. (*See*

---

[1] The Agreement incorrectly states that it was executed on November 20, 2018 (*See* Doc. 22-2, Preamble.)

3

Doc. 34 at ¶ 36.)  According to Cushman, Babcock received a raise and benefits in conjunction with both her six-month review and the signing of the Employment Agreement.  (*Id.* ¶¶ 33–34.)  And, although there is a dispute whether the Court should consider this fact, (*see* Doc. 42), Cushman alleges that Jonathan Cushman specifically mentioned the restrictive covenants at Babcock's review, (*see* Docs. 40 at ¶ 2, 40-1 at ¶¶ 8–9).  These disagreements are discussed in detail below.

The Employment Agreement contains several restrictive covenants, including noninterference with business relations and non-competition clauses. (*See* Doc. 22-2 at §§ 4.3, 4.4.)  It also contains a choice of law provision, (*id.* § 6.3), and states that the place of performance was to be Babcock's home address in Kalispell, (*id.* § 1.3; Doc. 34 at ¶ 42).  The Agreement further states that it would be "re-entered on an annual basis, with changes as negotiated by the parties."  (Doc. 22-2 at § 2.2.)  Consistently, the parties signed three separate "Employment Agreement Amendments," in 2019, 2020, and 2021, modifying Babcock's wages and/or benefits.  (*See* Docs. 27-25, 27-9, 27-11.)

While still working for Cushman in February 2022, Babcock sent a resume and letter to Kiowa, confirming her interest in a full-time finance position with Kiowa.  (Doc. 34 at ¶¶ 69–70; *see* Doc. 27-27.)  In March 2022, Babcock resigned from her role at Cushman as a "Senior Accountant," (Doc. 27 at ¶ 7; Doc. 34 at ¶ 30), and subsequently undertook work for Kiowa as an independent contractor,

(Doc. 27 at ¶ 23; *see* Doc. 27-28).  According to Babcock, in light of the terms of the Employment Agreement, she and Kiowa were careful to ensure that Babcock was only hired to work on project-based assignments and that Kiowa would continue to use Cushman for accounting services.  (Doc. 27 at ¶ 24.)  In support of that contention, Babcock claims she had multiple conversations with Kiowa to emphasize that her work was not intended to undermine or conflict with Cushman's relationship with Kiowa.  (*Id.* ¶ 25.)  Cushman's view is that Babcock provided services either very similar to those provided by Cushman or to those that could be provided by Cushman as part of its existing relationship with Kiowa.  (*See id.*)  Whatever the situation was, Kiowa remained a Cushman client until Cushman recently terminated that relationship, (*see* Doc. 58-1), Cushman believes that it suffered a "significant reduction in revenues from Kiowa" based on the services being provided by Babcock.  (Doc. 27 at ¶ 26.)

In November 2022, Cushman commenced an arbitration action against Babcock in Washington.  (*See* Doc. 27-13; Doc. 27 at ¶ 27.)  On January 3, 2023, Cushman filed a Complaint in Montana State District Court, Flathead County, seeking to compel arbitration.  (*See* Doc. 27-14.)  Cushman dismissed the Complaint without prejudice on February 13, 2023.  (*See* Doc. 27 at ¶ 27.)  In both instances, had the petition or case been pursued, Washington law would likely have dictated the outcome.

On May 13, 2024, Cushman initiated the present lawsuit, alleging breach of contract, tortious interference with economic advantage, misappropriation of trade secrets under both state and federal law, and unjust enrichment.  (Doc. 1.)  About six months later, Cushman amended its pleading, dropping the trade secrets counts. (Doc. 17.)  There are five pending motions.  First, the parties both seek partial summary judgment on the question of whether the restrictive covenants are enforceable.  (Docs. 20, 25.)  Second, Babcock seeks to strike certain additional evidence and exhibits submitted by Cushman as part of its reply, (*see* Docs. 39, 40, attachs.).  (Doc. 42.)  Finally, the parties dispute whether Babcock should be compelled to produce information regarding her work with Kiowa over Kiowa's objection.  (Docs. 44, 46.)  A hearing was held on April 7, 2025.

## ANALYSIS

The crux of the parties' dispute is whether the restrictive covenants contained in the 2018 Employment Agreement are enforceable and, relatedly, what law applies to that analysis.  While Babcock argues for the application of Washington law under the choice of law provision contained in the Agreement, Cushman insists that Montana law applies, either through the operation of a limited exception contained in the choice of law provision and/or through the application of choice of law principles.  Ultimately, Cushman prevails on the choice of law issue, which means Montana law governs the restrictive covenants at issue here.

Whether either covenant is enforceable, there is a genuine issue of material fact

regarding whether Babcock received independent consideration for the restrictive

covenants. Thus, this question cannot be resolved on the present motions. And

because the factual information provided by Cushman with its reply, (*see* Docs. 39,

40, attachs.), bears directly on that dispute, the filings are not stricken.

Nonetheless, one of the covenants, § 4.4, is an unreasonable restraint on trade and

therefore unenforceable in Montana as a matter of law. Finally, Cushman's motion

to compel is granted, although fees are not awarded.

 The pending motions are addressed in turn below, starting with the motion to

strike, followed by the cross-motions for partial summary judgment and the

discovery dispute.

## I. Motion to Strike

 In support of the pending cross motions for partial summary judgment, both

parties have filed a litany of exhibits. (*See* attachs. to Docs. 22, 24, 27, 33, 34, 37,

38, 40.) Babcock seeks to strike the exhibits and related factual allegations

included in Cushman's Response to Babcock's Statement of Additional Facts, (*see*

Doc. 40), filed in support of Cushman's Reply in Support of its Cross-Motion for

Summary Judgment, (*see* Doc. 39). (Doc. 42.) In response, Cushman argues that

cross-motions for summary judgment present a unique procedural posture and that

the evidence submitted with its reply was not "new," but rather provided more

context for the existing record. The information could have been provided earlier but Cushman's factual assertions are responsive to the issues raised in Babcock's most recent filing and are material to the contractual question at issue. Thus, it is not appropriate to strike them.

"Generally, reply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion." *Townsend v. Monster Beverage Co.*, 303 F. Supp. 3d 1010, 1027 (C.D. Cal. 2018) (internal quotation marks omitted). Accordingly, district courts may decline to consider new evidence or arguments presented in such a reply, and generally "should not consider the new evidence without giving the non-movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). However, "where the evidence submitted in the reply brief is submitted in direct response to proof adduced in opposition to a motion . . . it is not new." *Lisner v. City of Huntington Park*, 2020 WL 12893774, at *3 (C.D. Cal. Oct. 22, 2020); *see also Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1205 n.31 (C.D. Cal. 2007) ("Evidence is not 'new[]' . . . if it is submitted in direct response to proof adduced in opposition to a motion.").

Here, Babcock persuasively argues that the information submitted by Cushman in support of its reply brief, (*see* Docs. 39, 40), was known by Cushman at the time it filed its initial briefing and could have been included at that time. The 24 pages of exhibits attached to Doc. 40 consist of the following:

Ex. EE     Second Declaration of Jonathan Cushman (Doc. 40-1)

Ex. FF     Second Declaration of Candice Cushman (Doc. 40-2)

Ex. GG     11/20/18 Emails from Babcock to Candice (Doc. 40-3)

Ex. HH     01/02/19 Emails between Babcock, Candice, and Nick Palmer
of HealthMarkets Insurance Agency (Doc. 37, sealed)

Ex. II     Timecard Excerpt (Doc. 38, sealed)

As alluded to above, these allegations and exhibits focus primarily on the relationship between the increased employment benefits Babcock received in November 2018, what was said at Babcock's November 20, 2018 six-month review, and the ultimate execution of the December 12, 2018 Employment Agreement. According to Cushman, all three things were inextricably linked, and the Employment Agreement merely memorialized Babcock's increased benefits and the parties' discussion at the six-month review.

Notably, Exhibit EE is the first time that Jonathan Cushman asserts that he and Candice Cushman specifically told Babcock about the restrictive covenants during her six-month performance review. (*See* Doc. 40-1 at ¶¶ 8–9.) While Jonathan's prior declaration specifically discusses the November 20, 2018 meeting, it does not mention any discussion of the restrictive covenants. (*See* Doc. 27-1; *see also* Doc. 27 at ¶¶ 36–38.) However, this information was responsive to Babcock's briefing and bears directly on the central question of whether the Employment Agreement was supported by independent consideration.

9

Accordingly, neither Cushman's reply nor the attached exhibits are stricken. And because the dispute is purely factual in nature—i.e., the parties directly dispute what was said at a meeting they both attended—allowing Babcock to further respond would not resolve the matter. Babcock's motion to strike is denied.

## II.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it impacts the outcome of the case in accordance with governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences must be viewed in the light most favorable to the non-moving party. *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014). On cross-motions for summary judgment, it is the court's "independent duty to review each cross-motion and its supporting evidence . . . to determine whether the evidence demonstrates a genuine issue of material fact." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001). Each motion is therefore evaluated separately, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (quotation marks omitted).

Here, the parties disagree about what law governs the Employment
Agreement and whether, under that law, the restrictive covenants are enforceable.
Babcock argues that Washington law applies but that under either Washington or
Montana law, the restrictive covenants are unenforceable because they lack
adequate, independent consideration.  She further argues that even if there is
consideration, the covenants are unenforceable as unreasonable restraints on trade
in both forums.  On the other hand, Cushman argues that Montana law applies,
there was adequate consideration, and the covenants survive under Montana's
reasonableness test.  Cushman is correct that Montana law applies but outstanding
questions of fact prevent a finding that there was consideration.  Nonetheless § 4.4
of the Employment Agreement is unenforceable as a matter of law.[2]

### A.    Choice of Law

Section 6.3 of the Employment Agreement contains the following choice of
law provision:

> This Agreement shall be governed, construed, interpreted, and enforced
> in accordance with the substantive law of the State of Washington and
> federal law, without regard to conflicts of law principles, except as
> expressly provided herein.  In the event Employer exercises its
> discretion under Section 6, Paragraph 1 to bring an action to enforce the
> covenants contained in Section 4, Paragraphs 4.2 to 4.5 in a court of
> competent jurisdiction where the Employee has breached or threatened
> to breach such covenants, and in no other event, the parties agree that
> the court may apply the law of the jurisdiction in which such action in

---

[2] The parties do not seek summary judgment on the question of whether Babcock
breached the covenants.

[sic] pending in order to enforce the covenants to the fullest extent permissible.

(Doc. 22-2 at 7.) Based on this language, Babcock argues that Washington law applies and that the latter portion of the provision that allows for the application of the forum state's law is unconscionable. Cushman claims that Montana law applies both under the language of § 6.3 and through a choice of law analysis. Cushman has it right on the choice of law question.

"Federal courts sitting in diversity must apply the forum state's choice of law rules to determine the controlling substantive law." *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005) (internal quotation marks omitted). Montana has adopted the *Restatement (Second) of Conflict of Laws* for resolving choice of law disputes. *Barber v. Bradford Aquatic Grp., LLC*, 539 P.3d 648, 651 (Mont. 2023). Where a contract contains an explicit choice of law clause, the analysis follows § 187 of the *Restatement*, which means that Montana will apply the law of the state chosen by the parties unless three factors are met: "(1) if, but for the choice-of-law provision, Montana law would apply under § 188 of the Restatement; (2) if Montana has a materially greater interest in the particular issue than the state chosen by the parties; and (3) if applying the state law chosen by the parties would contravene a fundamental policy of Montana." *Id.* at 652 (internal quotation marks omitted). In contrast, § 188, which considers which state has the most "significant relationship to the transaction and the parties," governs situations

12

where there is no effective choice of law provision. *See Modroo v. Nationwide Mut. Fire Ins. Co.*, 191 P.3d 389, 400 (Mont. 2008).

### 1.    Chosen Law

Babcock first argues that the choice of law provision is in part unconscionable as the Employment Agreement is a contract of adhesion and the language permitting Cushman to shift the selection of law unfairly benefits Cushman.[3]  While she may be correct as to the former, she fails to show the latter.

As argued by Babcock, a court "must determine whether the agreement containing the [choice of law] clause is invalid" under the law of the forum state before applying choice of law principles. *Unarce v. Staff Builders, Inc.*, 61 F.3d 912, at *1 (9th Cir. 1995) (citing *Restatement* § 187 cmt. b); (*see also* Doc. 31 at 26–27 (collecting cases)).  Under Montana law, "unconscionability is a two-element equitable doctrine rendering an otherwise validly formed contract or term unenforceable if (1) the contract or term is a contract of adhesion and (2) the contract or term unreasonably favors the stronger party or is unduly oppressive to the weaker party." *Lenz v. FSC Secs. Corp.*, 414 P.3d 1262, 1274 (Mont. 2018) (footnote omitted).  "A contract of adhesion is a standard form contract prepared by one party, to be signed by the party in the weaker position (usually a consumer),

---

[3] While defense counsel's argument at the April 7 motions hearing blurred the lines a bit, Babcock's unconscionability argument is directed specifically at the choice of law provision, not a challenge to the contract as a whole.

who adheres to the contract with little or no choice about its terms." *Junkermier,*

*Clark, Campanella, Stevens, P.C. v. Alborn, Uithoven, Riekenberg, P.C.*, 380 P.3d

747, 756 (Mont. 2016) ("*Junkermier I*") (internal quotation marks omitted).  While

"[d]isparity in bargaining power is an essential element of a contract of adhesion, .

. . [it] does not equate to unenforceability and not all standardized contracts are

unenforceable as adhesion contracts." *Id.* (internal quotation marks omitted).

    Here, there is no dispute that the Employment Agreement was drafted by

Cushman as a form agreement that it intended to have all its employees sign.  (*See*

Doc. 27-21 ("Our attorney drafted employment contracts and this contract will be

something all employees review and sign annually.").)  Also, Babcock lacked

bargaining power as she was merely an employee of Cushman, not a partner or

shareholder, and this was only her second professional job.  (Doc. 34 at ¶ 61.)

These factors favor of finding of adhesion.  Nevertheless, the Agreement contains

language specific to Babcock, including a reference to her remote work agreement,

(Doc. 22-2 at § 1.3), her hourly wage, (*id.* § 3.1), and her health insurance

enrollment, (*id.* § 3.2).  *Compare with Lenz*, 414 P.3d at 1274 (describing

"[p]reprinted, standard-form consumer contracts [as] typically contracts of

adhesion").  Also, Babcock is not necessarily an "unsophisticated and unsuspecting

ordinary citizen[]," *Junkermier I*, 380 P.3d at 756, as she holds a master's degree

in accounting, (Doc. 27 at ¶ 5).

On balance then, the record is mixed as to whether the Employment

Agreement was a contract of adhesion. But even if it was, Babcock does not then

show that applying the Employment Agreement's choice of law provision,

specifically the employee-specific forum choice language, "unreasonably favors

[Cushman] or is unduly oppressive." *Lenz*, 414 P.3d at 1274; *see Rst.* § 187 cmt.

b; *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 918 (9th Cir. 2003) ("[T]he

Restatement provides that courts should not apply choice-of-law provisions in

adhesion contracts if to do so would result in substantial injustice to the

adherent."). Cushman seeks to apply the law of the forum where Babcock herself

chose to work and live. As is clear in the facts outlined above, Cushman itself has

no other real contact with Montana. Thus, Babcock's unconscionability argument

fails.

Babcock alternatively argues that the law-shifting language in § 6.3 is

permissive, so it should not be enforced. Indeed, the provision states that the Court

"*may* apply the law of the jurisdiction in which such action in [sic] pending in

order to enforce the covenants to the fullest extent permissible." (Doc. 22-2 at

§ 6.3 (emphasis added).) But Babcock provides no suggestion as to what should

guide the Court's discretion in this context. Cushman, however, persuasively

argues that if this permissive language is triggered, it means that the parties have

*not* agreed on a governing law for the contract and, as a result, the Employment

Agreement should be treated as though it does not contain a choice of law

provision so the Court must apply *Restatement* § 188, not *Restatement* § 187.  *See*

*Tidyman's Mgm't Servs. Inc. v. Davis*, 330 P.3d 1139, 1147–48 (Mont. 2014)

("Where contracting parties fail to select an effective choice-of-law provision, . . .

§ 188 of the *Restatement* governs.").

### 2.    Section 188

In the absence of an effective choice of law provision, § 188(1) provides

that "[t]he rights and duties of the parties with respect to an issue in contract are

determined by the local law of the state which, with respect to that issue, has the

most significant relationship to the transaction and the parties under the principles

stated in § 6."  In turn, § 6(1) states that a court, "subject to constitutional

restrictions, will follow a statutory directive of its own state on choice of law."

Montana law provides that a "contract is to be interpreted according to the law and

usage of the place where it is to be performed or, if it does not indicate a place of

performance, according to the law and usage of the place where it is made."  Mont.

Code Ann. § 28–3–102.  Babcock argues that because the Employment Agreement

does identify a place of performance, it should be governed by Washington law, as

it was undisputedly executed in Olympia, Washington.  (*See* Doc. 22-2, Preamble.)

Cushman takes the opposite position and argues that the Agreement identifies the

place of performance as Montana.  (*See id.* § 1.3.)  Because Cushman is correct, Montana law applies under § 188(1).

The Employment Agreement states that "throughout the term of this Agreement, the Employee shall work from 69 Konley Drive, Kalispell, MT 59901."  (*Id.*)   Although it is undisputed that Babcock did not work for Montana clients, she performed her work from her home in Montana, (Doc. 27 at ¶ 11), her paychecks were sent to her address in Montana, and Cushman paid Montana unemployment taxes and workers' compensation, (Doc. 34 at ¶¶ 62–66). Babcock paid Montana income tax and was Cushman's registered agent in Montana.  (Doc. 27 at ¶ 2; Doc. 34 at ¶¶ 63, 67.)  Babcock never travelled to either Washington (place of contracting) or Oklahoma (location of primary client, Kiowa) for work. (*See* Doc. 34 at ¶¶ 48–50.)   Considering these facts in conjunction with the explicit terms of the Agreement, the "place of performance" of this contract was Montana. *See McCue v. Integra Imaging, P.S.*, 2020 WL 3877137, at \*4–5 (D. Mont. July 9, 2020) (determining Montana was the place of performance in employment termination dispute where employee: lived in Montana, worked exclusively at a facility in Montana, never travelled to employer's out-of-state facility, deposited his salary into a Montana bank account, and paid income taxes in Montana); *see also Mitchell v. St. Farm Ins. Co.*, 68 P.3d 703, 709 (Mont. 2003) (determining Montana was the place of performance for insurance contract because, *inter alia*,

17

the insured was working and living in Montana, her medical expenses arose in

Montana, and judgment concerning accident was rendered and paid in Montana).

Because Montana is the place of performance and the permissive language

of the choice of law provision in the Employment Agreement does not "provide

otherwise," Montana law applies here. *Modroo*, 191 P.3d at 401. Accordingly, the

Court "need not consider whether Montana possesses a materially greater interest

in the contract issue than another state." *Id.*; *cf. Mitchell*, 68 P.3d at 708–09

(discussing an insurance agreement that did not have a choice of law provision);

*Tidyman's*, 330 P.3d at 1148–49 (discussing the interplay between § 187, § 188(1),

and § 188(2)).

## B. Enforceability

Because Montana law applies, the only remaining question on the motions

for partial summary judgment is whether the restrictive covenants contained in the

Employment Agreement are enforceable as a matter of law. Under Montana law,

"[c]ontracts in restraint of trade are disfavored[.]" *Access Organics, Inc. v.*

*Hernandez*, 175 P.3d 889, 902 (Mont. 2008). Specifically, "[a]ny contract by

which anyone is restrained from exercising a lawful profession, trade, or business

of any kind, otherwise than is provided for by 28-2-704 or 28-2-705, is to that

extent void." Mont. Code Ann. § 28-2-703. Nonetheless, a partial restriction on

trade may be upheld so long as it meets three requirements:

18

(1) [i]t must be partial or restricted in its operation in respect either to time or place;

(2) it must be on some good consideration; and

(3) it must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public.

*Access Organics*, 175 P.3d at 902 (internal quotation marks omitted). The party seeking to enforce the restrictive covenant bears the burden of proving that the agreement does not violate § 28-2-703. *Id.* Because "Montana's public policy strongly disfavors agreements in restraint of trade," non-compete agreements are "strictly" construed. *Id.* at 902. Accordingly, such an "agreement will not be extended by implication, and it will be construed in favor of rather than against the interests of the covenantor." *Id.* (internal quotation marks omitted).

Babcock argues that the restrictive covenants at issue here are not enforceable because they lack independent consideration and because they are overly broad. In response, Cushman claims that Babcock received benefits and a salary increase as consideration for entering into the Employment Agreement and that the terms of the covenants are reasonable. Ultimately, a genuine issue of fact remains as to whether there was independent consideration for the restrictive covenants. If no such consideration existed, neither covenant—§ 4.3 or § 4.4—is enforceable. But even if there is adequate consideration, Babcock is correct in arguing that § 4.4 is unenforceable as an unreasonable restraint on trade.

19

### 1.    Consideration

Babcock first argues that the covenants were not supported by "good consideration." Under Montana law, "[a]ny benefit conferred or agreed to be conferred upon the promisor by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor is a good consideration for a promise." Mont. Code Ann. § 28-2-801. "A written instrument is presumptive evidence of consideration." Mont. Code Ann. § 28-2-804. "Consideration exists if the employee enters into the non-compete agreement at the time of hiring." *Access Organics*, 175 P.3d at 903. However, because "past consideration is not sufficient to support a promise[,] . . . [n]on-compete agreements entered into by existing employees m[ust] be supported by independent consideration." *Id.* (internal quotation marks omitted). "For example, an employer may provide an employee with a raise or promotion in exchange for signing a non-compete agreement. In such instances, the salary increase or promotion serves as good consideration. Access to trade secrets or other confidential information may also suffice as a form of good consideration." *Id.* Nonetheless, "[w]hen a current employee is required to sign a non-compete agreement, the employer and employee are not on equal bargaining ground: the employee is vulnerable to heavy economic pressure to sign

20

the agreement in order to keep his job." *Id.* at 904. Given the underlying public

policy concerns, the enforcing party must provide "clear evidence that the

employee received good consideration in exchange for bargaining away some of

his post-employment freedom to practice the profession or trade of his choice." *Id.*

Here, the parties dispute whether the restrictive covenants at issue were

negotiated as part of the new employment benefits Babcock received in November

2018. According to Babcock, the raise and increased benefits she received in

November 2018 pre-dated the December 12, 2018 Employment Agreement and

therefore do not qualify as consideration for the restrictive covenants contained in

that Agreement. According to Cushman, the discussions and correspondence

surrounding Babcock's raise, increased benefits, and six-month review were part

of the negotiations underlying, and therefore were subsequently memorialized in,

the Employment Agreement.

Certain facts are undisputed:

- Candice Cushman sent Babcock an email on November 20, 2018 that

    indicated that Babcock would be sent an employment contract that would

    be "something all employees review and sign annually,"[4] (Doc. 27-21);

---

[4] It is disputed whether this email was sent/received before or after Babcock's six-month review. While likely not material, Babcock states that she received it after. (*See* Doc. 34-1 at ¶ 11.)

- That same November 20, 2018 email indicated that Babcock's pay was increased to $21/hour, (*id.*);

- Babcock's six-month performance review was held remotely on November 20, 2018, and it was attended by both Jonathan and Candice Cushman, (*see* Doc. 34 at ¶ 36);

- A future employment contract was mentioned at Babcock's six-month review, (*id.*), as were Babcock's raise and sick time, (*id.* ¶ 37);

- Babcock received a raise from $20/hour to $21/hour beginning with her pay period November 18, 2018 to December 1, 2018, (*id.* ¶ 35);

- Babcock received sick leave for the first time for the pay period November 18, 2018 to December 1, 2018, (Doc. 34-1 at ¶ 16); and

- the first time Babcock saw the Employment Agreement was when it was emailed to her on December 11, 2018, and she returned a signed version on December 12, 2018, (Doc. 34 at ¶¶ 33, 41).

The parties view the facts differently, however, as to whether Babcock's raise and benefits were "negotiated" during her six-month review or were in anyway tied to the later-executed Employment Agreement, (*see* Doc. 34 at ¶¶ 34–35, 37–38, 41), and whether the restrictive covenants were discussed at Babcock's six-month review, (*see id.* ¶ 36). The latter dispute directly relates to Babcock's motion to strike, (*see* Doc. 42), which is discussed above. Specifically, in his second

declaration, Jonathan Cushman states that, during Babcock's six-month review, they discussed that her raise was based on her entering into the Employment Agreement, (Doc. 40-1 at ¶ 6), and that the Employment Agreement would contain covenants not to compete, (*id.* ¶¶ 8–10). According to Babcock, however, the yet-to-be-written employment agreement was merely mentioned, with no discussion of its substantive terms. (*See* Doc. 34-1 at ¶¶ 8–10.) Because this dispute is both genuine and material to whether Babcock received consideration in return for agreeing to the restrictive covenants, it forecloses summary judgment on this question.

As an alternative, independent argument supporting consideration, Cushman contends that Babcock re-entered the Employment Agreement every year based on the Employee Agreement Amendments that were entered in 2019, 2020, and 2021. (Docs. 27-25, 27-9, 27-11.) Indeed, the Employee Agreement itself contemplated that it would be "re-entered on an annual basis, with changes as negotiated by the Parties." (Doc. 22-2 at § 2.2.) However, none of those Amendments refer to the original Employment Agreement more generally or to the restrictive covenants more specifically. (*See, e.g.*, Doc. 27-9 (May 2020 Amendment).) Rather, the Amendments each state: "in order to induce the Employee to be employed or continue to be employed in such positions, the Employer desires to provide the Employee with compensation and other benefits on terms and conditions *set forth*

23

*in this Amendment*," and "the Employee is willing to accept such employment and perform services for the Employer, *on the terms and conditions hereinafter set forth*." (*See id.* (emphasis added).) Thus, while these Amendments are individually enforceable and are supported by consideration, they do not bear on the original Agreement that contains the restrictive covenants.

Based on the foregoing, whether there was adequate, independent consideration for the restrictive covenants cannot be answered on this record. That dispute is only material, however, to the extent the covenants are otherwise enforceable, as discussed below.

### 2.    Reasonableness

As indicated above, Montana applies a "reasonableness" test to restrictive covenants. *Access Organics*, 175 P.3d at 902. Under the third prong of Montana's reasonableness test, a covenant "must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public." *Mont. Mtn. Prods. v. Curl*, 112 P.3d 979, 982 (Mont. 2005) (internal quotation marks omitted). The Montana Supreme Court has interpreted this to mean that covenants that "outright prohibit[]" an individual from practicing his or her profession are void, *id.*; *see* Mont. Code Ann. § 28–2–703, but those that are "not an absolute prohibition" must be assessed for reasonableness, "consider[ing] whether the

employer possesses a legitimate business interest in the covenant," *Junkermier, Clark, Campanella, Stevens, P.C. v. Alborn*, 469 P.3d 111, 117, 118 (Mont. 2020) ("*Junkermier II*"). "Courts will not enforce covenants if an employer lacks a legitimate business interest." *Wrigg v. Junkermier, Clark, Campanella, Stevens, P.C.*, 265 P.3d 646, 650 (Mont. 2011). Restrictive covenants are read "in a light most favorable to the employee." *Id.* at 649. Applying this framework here, § 4.3 survives but § 4.4 does not.

### i.    Section 4.3: Noninterference

Section 4.3 of the Agreement provides:

> *Noninterference with Business Relations*. The Employee hereby covenants and agrees that during the term of Employment and for three years after termination of Employment, the Employee shall not, without the prior written consent of the Employer, on the Employee's own behalf or on the behalf of any person, firm or company, directly or indirectly, attempt to influence, persuade or entice, or assist any other person so persuading or inducing, any person, firm or company to cease doing business with, reduce its business with, or decline to commence a business relationship with, the Employer. This term expressly applies, without limitation to all clients of Employer identified on the Client Addendum hereto and to any subsequent addendums on future annual Agreements. Notwithstanding the addendum, this term applies to all clients of Employer known to Employee during the term of Employment. This term shall apply to former clients of Employer[] if Employer provided services for the client within two years of the termination of Employee's Employment, but shall not apply to clients who have not been active clients of Employer for longer than two years.

Put simply, § 4.3 prevents Babcock from working with Cushman's clients for a period of three years. Such a restriction, i.e., a temporary limitation based solely

on Cushman's client list, is reasonable as Montana recognizes that a business has a "legitimate business interest in . . . protecting its client base." *Junkermier II*, 469 P.3d at 118.

However, as argued by Babcock, there is one portion of § 4.3 that arguably goes a step further: "Employee shall not, without the prior written consent of the Employer, . . . directly or indirectly, attempt to influence, persuade or entice, or assist any other person so persuading or inducing, any person, firm or company to cease doing business with, reduce its business with, or *decline to commence a business relationship with, the Employer*." (Doc. 2-2 at § 4.3 (emphasis added).) Babcock argues that this language prevents her from engaging in accounting business of any kind, as anyone could be a potential Cushman client. But even a strict reading of the covenant prevents such an interpretation as the provision is tied specifically to Cushman's client list, which includes identified "prospective" clients. (*See, e.g.*, Doc. 27-16 (2022 Client List).) For example, at the time of her termination in 2022, Babcock was only prevented from engaging in accounting services for 11 existing clients and 7 prospective clients, none of which were in Montana. (*See id.*; *see also* Doc. 26 at 25 ("Cushman concedes Babcock is not prevented from serving clients who were not Cushman clients or were not listed on Cushman's prospective client list.").) Thus, § 4.3 is not an unreasonable restraint on trade.

26

ii.    **Section 4.4: Noncompetition**

Section 4.4 of the Employment Agreement states that because employees

have access to proprietary information,

> *Noncompetition* . . . the Employee acknowledges that the foregoing
> makes it reasonably necessary for the protection of Employer's
> business interest that the Employee not directly compete with the
> Employer during the Term of Employment and for a period of three
> years following the termination of Employment. As used in this clause,
> "direct competition" means competition for the business of clients on
> the Client Addendum or any subsequent or previous Client Addendum,
> unless that client has ceased to be a client of Employer for more than
> two years. Further, "direct competition" means competition for the
> business of a potential client Employee has contacted in the course of
> Employee's work for Employer during the year prior to termination for
> the purposes of soliciting business or offering, explaining, or marketing
> services. Further, the Employee will not undertake work for a
> Competing Business, as defined below. For purposes of this covenant,
> "undertake work for" shall include performing services, whether paid
> or unpaid, in any capacity . . . where such services involve the
> marketing or performance of substantially similar duties or oversight
> responsibility as those performed by the Employee during the 12-month
> period preceding the Employee's termination of Employment. As used
> in this Agreement, the term "Competing Business" shall mean any
> business that, at the time, of the determination completes audits or
> accounting services.

Babcock argues that this provision, particularly the latter half, operates as an

absolute prohibition on her working as an accountant and is therefore void. *See*

Mont. Code Ann. § 28-2-703. Babcock is correct.

For the reasons discussed above, the first part of § 4.4 is a reasonable

restriction on Babcock's ability to solicit Cushman's client base. *Junkermier II*,

469 P.3d at 118. However, the "Competing Business" language of § 4.4 is

27

problematic.  In arguing that the "Competing Business" provision is not an

absolute prohibition on Babcock's ability to work, Cushman contends that its

scope is limited because "undertake work for" is narrowly defined to include only

"performing services . . . of substantially similar duties or oversight responsibilities

as those performed by [Babcock] during the 12-month period preceding

[Babcock's] termination of Employment." (Doc. 22-2.2)  According to Cushman,

this definition reasonably narrows the broader definition of "Competing Business,"

which means one that "completes audits or accounting services," (*id.*), because it

means that the provision only "prevent[s] Babcock from undertaking work for an

accounting or auditing business working for Cushman clients after her

termination," (Doc. 26 at 28).  Not so.  Unlike § 4.3, there is nothing in the

"Competing Business" portion of § 4.4 that limits its scope to Cushman's clients.

Read as a whole, § 4.4 prevents Babcock from performing the accounting work she

was doing for Cushman for not only Cushman clients, but for any tribe or

governmental entity that requires accounting services akin to those provided by

Cushman.  For example, § 4.4 would prevent Cushman from undertaking

accounting work with a tribe that is not identified as a prospective client of

Cushman, such as the Blackfeet Tribe despite the lack of any relationship between

Cushman and that entity.  Nevertheless, contrary to Babcock's argument, § 4.4

does not absolutely prevent her from working as an accountant.  It would, for

example, as argued by Cushman, permit Babcock to work as a tax preparer for private individuals. Because § 4.4 is not an "absolute prohibition" on Babcock's ability to work in the accounting field, "a determination must be made as to the covenant's reasonableness." *Junkermier I*, 380 P.3d at 757.

The first question then is whether Cushman had a legitimate business interest in preventing Babcock from performing accounting services for governmental or tribal entities that are not former, current, or prospective Cushman clients. *See Wrigg*, 265 P.3d at 650. Generally, "[a]n employer possesses a legitimate [business] interest to protect itself from an employee appropriating valuable trade information, good will, and customer relationships to compete directly against—and take business from—his former employer." *Id.* at 651. However, because Cushman itself does not believe the covenant extends to non-clients, it has not articulated a legitimate business reason to restrict work for non-clients. And while Cushman has indicated that it specializes in the type of accounting services it provides Kiowa and that Babcock may have taken "proprietary information that would provide [her] with an unfair advantage" in that relationship, Cushman has not identified anything Babcock possesses that would implicate Cushman "trade secrets or intimate knowledge regarding any special accounting needs" of non-clients. *Id.* at 654, 652. Moreover, there is no

geographic limitation on § 4.4. It applies to any and all tribal or governmental entities nationwide. Section 4.4 is therefore not a reasonable restriction on trade.

Cushman argues that even if that is the case, the Court should "blue pencil" the offending language to make it reasonable; i.e., to make it apply to only Cushman's clients. Such reformation is not appropriate. *See Treasure Chem., Inc. v. Team Lab. Chem. Corp.*, 609 P.2d 285, 288 (Mont. 1980) (indicating that reformation only appropriate to make restriction consistent with "exceptions" to § 28-2-703 provided for in § 28-2-704 and § 28-2-705). Montana law makes clear: unreasonable restrictive covenants are void. Mont. Code Ann. § 28-2-703; *Access Organics*, 175 P.3d at 902. Section 4.4 is unenforceable as a matter of law.

## III. Discovery Dispute

Finally, the parties have a discovery dispute over what Kiowa-related work materials Babcock must disclose. Under Rule 37(a)(3)(B)(iv) of the Federal Rules of Civil Procedure, a party may move for an order compelling production if a party fails to produce documents requested under Rule 34. If no claim of privilege applies, production may be compelled regarding any matter that is "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The party opposing discovery bears the burden of resisting disclosure. *Miller v. Pancucci*, 141 F.R.D. 292, 299 (C.D. Cal. 1992). Conversely, under Rule 26(c), "[a] party or any person from whom discovery is sought may move for a protective order" and "[t]he court may,

30

for good cause, issue an order to protect a party or person from annoyance,

embarrassment, oppression, or undue burden or expense." "The party opposing

disclosure has the burden of providing 'good cause,' which requires a showing that

specific prejudice or harm will result if the protective order is not granted." *In re*

*Roman Catholic Archbishop of Portland*, 661 F.3d 417, 424 (9th Cir. 2011).

Babcock seeks a protective order under Rule 26(c)(1) that she is not required

to produce documents regarding her work for Kiowa without Kiowa's consent,

consistent with her contractual obligations with Kiowa. (Doc. 44.) On the other

hand, Cushman seeks an order compelling Babcock to produce documents and

communications reflecting the work she has performed for Kiowa. (Doc. 46.)

While Cushman prevails for the reasons provided below, the information obtained

pursuant to this Order is subject to a protective order and shall not be disclosed in

contravention of this Order. Additionally, because Babcock's course of conduct

was substantially justified by her contractual obligations to Kiowa, fees are not

awarded to either party.

A.    **Background**

Given the confidential financial information at issue in the case, the parties

entered into a Stipulated Protective Agreement on December 17, 2024, to facilitate

the disclosure and production of documents. (*See* Doc. 45-4.) That Agreement

allows the parties and third parties to designate, *inter alia*, "any document or

31

information, including interrogatory responses, other discovery responses or transcripts" as "Confidential." (*Id.* at 3–4.) Confidential documents are limited in use and cannot be transferred, disclosed, or communicated to others except as specified in the Protective Agreement. (*Id.* at 3.) Access to confidential documents is also limited. (*Id.* at 3–4.)

At the outset of discovery, in November 2024, Cushman sent a letter to Kiowa's Attorney General, Randall Homburg, for permission to disclose documents related to the services Cushman and Babcock perform for Kiowa in response to Babcock's discovery requests. (Doc. 45-3.) The letter stated that such documents may include invoices with narrative billing descriptions, work product prepared by either Cushman or Babcock, documents related to Kiowa's general ledger, and communications about the types of services performed. (*Id.* at 1.) That letter also attached Babcock's first discovery request, (*id.* at 3–20), and summarized Cushman's understanding of Kiowa's confidentiality requirements according to Kiowa's Independent Contractor Agreement with Babcock, (*id.* at 2; Doc. 45-1). Homburg followed up with a phone call and he and Cushman's counsel exchanged emails in December 2024. (*See* Docs. 47-7, 47-8.) Ultimately, according to Cushman, Kiowa gave the parties permission to exchange, subject to the Protective Agreement, documents and communications related to the services both parties provided to Kiowa, with the exception of "working papers," which

Homburg defined as consisting of "any financial document [Kiowa] produced to [Cushman] or their client for audit or accounting purposes." (*See id.*) Based on this understanding, Cushman produced documents and communications related to the services Cushman and Babcock performed for Kiowa and sought the same under Rule 34 from Babcock. (*See* Docs. 47-1, 47-2, 47-5, 47-19.)

In response, Babcock objected on the grounds that the requests were overbroad, unduly burdensome, in violation of client confidentiality, outside Babcock's custody and control, or sought Kiowa's "working papers" which she was not authorized to release. (*See id.*) In those responses, Babcock stated that based on her "conversation with the CFO of the Kiowa Tribe, it does not consent to Ms. Babcock producing emails or other aspects of its work without review and specific approval." (Doc. 47-2 at 3.) According to Babcock, Cushman should subpoena Kiowa directly for this information. (*Id.*)

Subsequently, both Babcock and Cushman reached out to Kiowa to see what, if anything, could be disclosed. In response, Kiowa not only declined further disclosure of any of its information but invoked "privilege" and indicated that "all employees of the Kiowa Tribe [were instructed] to have no contact with any attorney involved in this lawsuit from this point." (Doc. 45-13; *see also* Doc. 45-14.) Indeed, Kiowa specifically took umbrage with Cushman's conduct, stating:

> We do not appreciate being dragged into your lawsuit as a client. That
> is the utmost disrespect a licensed alleged professional can commit

upon their client. I am outraged and ashamed of the Plaintiff in this matter for even expecting a response or placing our e-mails into the discovery process in this dispute, which we deem petty, baseless and infantile.

(Doc. 45-12 at 1.) Subsequently, on April 1, 2025, Cushman terminated its

relationship with Kiowa. (Doc. 58-1.)

## B.    Discussion

In the present motion, Cushman has requested Babcock produce:

documents and communications (including emails and text messages) exchanged regarding Babcock's work for Kiowa from March 18, 2022 to the present, including those related to Babcock entering an agreement to provide work for Kiowa, Babcock's accounting or bookkeeping services, the non-compete provisions in Babcock's Employment Agreement with Cushman, Babcock's work related to the Kiowa General Ledger from March 18, 2022 to present, and communications and documents related to other specific accounting assistance that Babcock provided Kiowa from March 18, 2022 to present.

(Doc. 47 at 10.) At this stage, "Babcock does not dispute she has possession of the

information requested." (Doc. 50 at 4.) "Nor does she dispute that the information

at issue is potentially relevant, at least for the purposes of discovery." (*Id.*) Nor is

Babcock withholding information based on her assertion of accountant-client

privilege. Rather, the issue "is whether Babcock should be compelled to produce

Kiowa documents in the face of Kiowa's explicit instruction *not* to produce those

documents, and in violation of her Independent Contractor Agreement with

Kiowa." (*Id.* at 5.)

### 1.    Privilege

While Babcock does not assert accountant-client privilege, Kiowa appears

to. (*See* Doc. 45-12.)  Although Kiowa's correspondence with counsel indicates

that it believes Oklahoma law governs privilege here, (*see id.*), "in a civil case,

state law governs privilege regarding a claim or defense for which state law

supplies the rule of decision," Fed. R. Evid. 501.  Because Montana law applies to

the parties' contract disputes as discussed above, Montana privilege law applies to

this discovery dispute.  Under Montana law,

> Except by permission of the client, person, or firm engaging a certified
> public accountant or an employee of the accountant or by permission
> of the heirs, successors, or personal representatives of the client, person,
> or firm and except for the expression of opinions on financial
> statements, a certified public accountant or employee may not be
> required to disclose or divulge or voluntarily disclose or divulge
> information that the certified public accountant or an employee may
> have relative to and in connection with any professional services as a
> certified public accountant. The information derived from or as a result
> of professional services is considered confidential and privileged.

Mont. Code Ann. § 37-50-402(1).  Here, however, Babcock is not a certified

public accountant, (*see* Doc. 27 at ¶ 5), nor does she work for a certified public

accountant, (*see id.* ¶ 22).  Thus, neither her communications with Kiowa nor the

work she performed for Kiowa are privileged.[5]

### 2.    Babcock's Independent Contractor Agreement

---

[5] As argued by Cushman, this same result is correct under either Oklahoma or
Washington law, as both limit the privilege to licensed or certified public
accountants. *See* Wash. Rev. Code § 18.04.025(11), (12); 12 OK Stat. § 2502.1;
59 OK Stat. § 15.1A(39).

Babcock's contract with Kiowa states, in relevant part, that Babcock will not disclose "confidential information" "to any third party or use it for any purpose but to fulfill the obligations in" that agreement. (Doc. 45-1 at 4.) That restriction does not apply, however, to the confidential information that "is requested or legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demand, or similar processes)" so long as Babcock notifies Kiowa prior to disclosure and "provides reasonable assistance to [Kiowa] in obtaining a protective order." (*Id.* at 5.)

Here, Babcock argues that good cause exists to issue a protective order because disclosing the information to Cushman over Kiowa's objection would violate her contract with Kiowa. In turn, Kiowa has expressly stated that it wants its material left out of this litigation. (*See* Docs. 45-13, 45-14.) Thus, Babcock seeks an order "directing that Babcock is only required to disclose Kiowa information with Kiowa's consent." (Doc. 45 at 12–13.) In response, Cushman argues that while Babcock's contract with Kiowa requires that she inform Kiowa prior to disclosing the information and aid in getting a protective order, the contract explicitly permits disclosure in the civil discovery process, particularly if Babcock is "legally compelled or otherwise required to disclose." (Doc. 45-1 at 5.) Cushman is correct. Without the protection of privilege, it is unclear what grounds, if any, either Babcock or Kiowa have to avoid disclosure.

Under Rule 26(c), "[a] party asserting good cause bears the burden, for each particular document it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted." *Foltz v. St. Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003) (citing *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002)). It seems that Babcock's allegation of harm is that she will be subject to liability for producing anything over Kiowa's objection. As indicated above, that argument lacks merit as her contract with Kiowa permits, albeit grudgingly, disclosure in the civil discovery context when such disclosure has been court ordered. To the extent Babcock's motion is premised on potential harm to Kiowa, a nonparty, based on its noninvolvement in the case and its desire to keep its financial information confidential, such a generalized assertion is insufficient to establish "good cause." *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test."); *cf. United States v. Real Property Located in L.A., Cal.*, 345 F.R.D. 189, 192–93 (C.D. Cal. 2023) (rejecting the State of Kuwait's request to retroactively designate a small number of documents as confidential because they "contain[ed] information relating to the State of Kuwait, its government, finances, and operations"). While it does not seem like a sound

business practice to force disclosure of a client's records, Cushman's discovery requests are permissible.

Nevertheless, Rule 26(c) is interpreted broadly to give a "trial court . . . substantial latitude to fashion protective orders." *Phillips*, 307 F.3d at 1212 (internal quotation marks and emphasis omitted). Thus, while the information sought by Cushman is discoverable, there may be specific cause to prevent specific documents from being disseminated publicly. Accordingly, Cushman must seek the Court's leave before it discloses the material provided in response to this Order to anyone other than the parties and their counsel here.

### 3.    Fees and Costs

Fees and costs are not awarded on either the motion for a protective order or the motion to compel because, consistent with the language of her Independent Contractor Agreement with Kiowa, Babcock was required to seek a protective order before disclosing materials Kiowa sought to keep private. (*See* Doc. 45-1 at 5); Fed. R. Civ. P. 37(a)(5)(A)(ii).

### CONCLUSION

Based on the foregoing, IT IS ORDERED that:

1.    Babcock's motion to strike, (Doc. 42), is DENIED.

2.    Both motions for partial summary judgment, (Docs. 20, 25), are GRANTED IN PART and DENIED IN PART. Cushman's motion is GRANTED

38

to the extent that Montana law governs the restrictive covenants at issue and § 4.3

is not an unreasonable restraint on trade; however, a genuine issue of fact remains

whether this provision was supported by independent consideration.  Babcock's

motion is GRANTED to the extent that § 4.4 is an unenforceable as a matter of

law.  The motions are DENIED in all other respects.

       3.     Babcock's motion for a protective order, (Doc. 44), and Cushman's

motion to compel, (Doc. 46), are GRANTED in PART and DENIED in PART.

While Babcock must respond to Cushman's discovery requests, Cushman must

seek the Court's leave before it discloses any of the material provided in response

to this Order to anyone other than the parties and their counsel in this case.

       DATED this 9th day of April, 2025.

                                           _____

                                           Donald W. Molloy, District Judge
                                           United States District Court